**Wayne E. GEORGE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3886.**

Court of Appeals of Alaska.

Aug. 28, 1992.

---

Gordon G. Goodman, Asst. Public Advocate and Brant G. McGee, Public Advocate, Anchorage, for appellant.

Cynthia L. Herren, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Wayne E. George was convicted of first-degree murder, AS 11.41.100(a)(1), first-degree robbery, AS 11.41.500(a)(3), and second-degree theft, AS 11.46.130(a)(3), following a jury trial in the Ketchikan superior court. For these crimes, George received a composite sentence of 106 years' imprisonment. George appeals both his convictions and his sentence. We affirm.

During the evening and early morning of June 29–30, 1989, George and three friends were out drinking in Ketchikan. They wandered throughout the town and ended up behind Talbot's Building Supply. There, a fisherman named Michael Tarbet joined them. George and his friends shared some of their tequila with Tarbet, and Tarbet shared some marijuana with George and the others. Then George began to kick and punch Tarbet, not stopping until Tarbet was semi-conscious. George took $11.00 from Tarbet's wallet and left Tarbet lying on the dock.

A short time later, one of George's companions urged him to go back to "do the job right and finish him off." George returned to the dock where Tarbet lay, then he rolled Tarbet into the water and watched him sink.

One month later, on July 21, the Alaska State Trooper Tactical Diving Unit discovered Tarbet's body. That same day, George was arrested in nearby Metlakatla for a liquor law violation. Metlakatla Police Officer Larry Lower brought George to the Metlakatla Police Department, where he read George his *Miranda* rights and placed him in a cell.

George paced back and forth in his cell, repeatedly saying that he needed to talk to someone. Officer Lower called George's pastor at the Metlakatla church, Reverend Blewett, asking him to come to the police department. After placing this call, Lower left to return to his patrol duties.

George spoke with his pastor for ten to fifteen minutes. After Reverend Blewett left, George asked the jailer, Officer Littlefield, whether Littlefield had heard about the recovery of a body in Ketchikan. Littlefield replied that he had not heard about it. George then told Littlefield that he was the one who had pushed that person over the dock, and that he wanted to speak to Officer Lower. Littlefield summoned Lower back to the police department.

Lower immediately contacted the Alaska State Troopers to verify that a body had been found in Ketchikan. The troopers confirmed that they had found a body; they gave Lower a description of Tarbet and the place where he had been found. Lower then returned to George, re-read him the *Miranda* rights, and obtained George's written waiver of those rights. George confessed to Lower that he had killed the person recently found in Ketchi-

kan; George described Tarbet and the details of how he had met his death. Lower did not record this interview because his tape recorder was broken.

Lower contacted the Ketchikan Police Department and informed them of George's confession. Ketchikan Police Sergeant Lee Meyer flew to Metlakatla the next day to interview George. Sergeant Meyer again read George his *Miranda* rights, and George again signed a written waiver of his rights. George then repeated much of what he had told Littlefield and Lower. However, George deviated from his prior statements in one crucial respect: he told Meyer that he had not pushed Tarbet into the water, but rather had hidden him on the dock behind some pallets.

Following his indictment by a Ketchikan grand jury, George moved to suppress his statements to Littlefield, Lower, and Meyer. George argued that his initial statement to Littlefield should be suppressed because he had not been advised of his *Miranda* rights. He argued that his follow-up statement to Officer Lower should be suppressed because Lower had violated the rule announced in *Stephan v. State*, 711 P.2d 1156 (Alaska 1985), by failing to tape record his interview with George.

Superior Court Judge Thomas E. Schulz found that George had been advised of his *Miranda* rights shortly after his arrest. Moreover, Judge Schulz ruled that George's statements to Littlefield were volunteered, not the product of custodial interrogation; thus, even if George had received no *Miranda* warning, his statements to Littlefield would still be admissible. George has not appealed this ruling.

With regard to George's statement to Lower, Judge Schulz ruled that the taping requirement announced in *Stephan* did not apply to the Metlakatla police, since Metlakatla is an Indian reservation outside the normal jurisdiction of the Alaska police. Judge Schulz also ruled that, if the taping requirement applied to the Metlakatla police, the taping requirement was excused because the testimony at the suppression hearing showed that the Metlakatla police's tape recorder was broken when Lower interviewed George. Finally, Judge Schulz ruled that the *Stephan* rule did not apply to George's case because George had failed to assert that any impropriety occurred during his interview with Lower, apart from Lower's failure to tape the interview.

On appeal, George renews his argument that his statements to Littlefield and Lower should have been suppressed for violation of the *Stephan* taping rule. Both George and the State have devoted considerable energy to arguing whether Alaska law governing police procedures (and, specifically, the *Stephan* rule) applies to the Metlakatla police. We find it unnecessary to resolve this issue.

■■■ The *Stephan* rule applies only to custodial interrogations. *Stephan*, 711 P.2d at 1162. Judge Schulz found, and George does not dispute, that George's statements to Littlefield were not the product of custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980). Thus, the admission of George's statements to Littlefield does not violate *Stephan*.

■■ With regard to George's statements to Lower, Judge Schulz found that the Metlakatla police did not have a functioning tape recorder. This fact excuses non-compliance with the *Stephan* rule. *Stephan*, 711 P.2d at 1164. More importantly, *Stephan* does not prohibit admission of a defendant's custodial statement "if no testimony is presented that the statement is inaccurate or was obtained improperly, apart from violation of the [taping] rule." *Id.* at 1165. On appeal, George does not contend that, apart from Lower's failure to tape the interview, there was any impropriety in his interview with Lower. Thus, George's statements to Lower are admissible under *Stephan*.

We turn now to George's sentencing arguments. Judge Schulz sentenced George to a term of 99 years' imprisonment for his first-degree murder conviction and a consecutive term of 7 years' imprisonment for his first-degree robbery conviction. (Judge Schulz imposed an additional 2–year sen-

tence for the second-degree theft, but he made this sentence concurrent with the robbery sentence.) Thus, George's total sentence is 106 years' imprisonment.

■ George argues that his 99–year sentence for first-degree murder is excessive. In *Riley v. State*, this court rejected a proposed benchmark sentence of 60 years' imprisonment for first-degree murder, noting that Alaska decisions "have consistently approved the imposition of maximum sentences" for this offense. 720 P.2d 951, 952 (Alaska App.1986). Judge Schulz found that George's act of killing Tarbet was premeditated and deliberate. The homicide thus would have qualified as first-degree murder even under the more stringent, common-law definition found in Alaska's former criminal code. *Riley*, 720 P.2d at 952 n. 1. George's conduct therefore presents a particularly serious form of first-degree murder.

Moreover, Judge Schulz found that, when George returned to kill Tarbet, George knew that Tarbet was particularly vulnerable due to his intoxication and the effects of George's previous attack. If first-degree murder were governed by presumptive sentencing, this would be an aggravating factor under AS 12.55.155(c)(5). (Judge Schulz found that the first-degree robbery was aggravated by this factor.) In addition, George's psychological evaluations indicated that he suffered from an antisocial personality disorder with aggressive and paranoid features, a type of disorder that is difficult to treat.

Judge Schulz's remarks at sentencing show that he analyzed George's offense under the criteria established in *State v. Chaney*, 477 P.2d 441 (Alaska 1970), and concluded that a maximum sentence was justified because of the seriousness of George's crime, the need to reaffirm social values, George's poor potential for rehabilitation, and the need to isolate George to protect the public from further acts of violence. We do not find George's 99–year sentence to be clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

■ George also argues that, even if his murder sentence is justified, Judge Schulz should not have imposed an additional 7 years' imprisonment for the robbery. Judge Schulz decided to impose consecutive sentences for the robbery and the murder because these crimes involved distinct societal interests and because, under the facts of this case, the robbery and the murder were distinct events. After committing the robbery and leaving Tarbet incapacitated, George walked away from the dock; he returned later for the specific purpose of killing the helpless Tarbet. Judge Schulz justifiably viewed the robbery and the murder as two separate crimes deserving separate punishments. *See Cooper v. State*, 595 P.2d 648 (Alaska 1979) (one assault on three victims; sentence greater than the maximum term for one count of assault); *Preston v. State*, 583 P.2d 787 (Alaska 1978) (unrelated crimes; sentence greater than the maximum term for the more serious crime); *Farmer v. State*, 746 P.2d 1300 (Alaska App.1987) (one assault on three victims plus unrelated crimes; sentence greater than the most severe presumptive term); *Jones v. State*, 744 P.2d 410 (Alaska App. 1987) (one assault on three people; sentence greater than the most severe presumptive term).

Judge Schulz recognized, however, that Alaska law restricts a sentencing judge's authority to impose consecutive sentences that exceed the maximum sentence permitted for the defendant's most serious crime:

> THE COURT: [The fact that the robbery and the murder were distinct crimes] does not necessarily mean that the sentences should exceed ... 99 years, because the court has said in a number of cases that ..., in cases that involve multiple felony convictions, ... you start off with the presumption that you sentence on the most serious felony and then only exceed that [maximum sentence] when you can make the finding that the defendant needs to be incarcerated—isolated to protect the public.

Here, Judge Schulz is referring to *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977), and its progeny. *See*, for example,

*Ross v. State,* 808 P.2d 290, 292–93 (Alaska App.1991).

Having recognized the applicability of this case law, Judge Schulz premised his decision to sentence George to a total of 106 years on specific findings that George was a dangerous offender who had committed a particularly serious type of first-degree murder, that George did not have a favorable outlook for rehabilitation, and that therefore George needed to be isolated for more than 99 years to protect the public. This decision was not clearly mistaken. *McClain,* 519 P.2d at 813–14.[1]

The judgement of the superior court is AFFIRMED.

**1.** George relies on language from *Thompson v. State,* 768 P.2d 127 (Alaska App.1989), where this court indicated in dictum that a sentence exceeding 99 years' imprisonment should not be affirmed unless the trial court has found that, in order to protect the public, "the defendant must spend the rest of his life in prison without any possibility of parole". 768 P.2d at 133–34. George interprets this language to mean that sentencing judges must make a finding over and above the requirements of *Mutschler v. State,* 560 P.2d 377, 381 (Alaska 1977). To the extent that such an interpretation is possible, it was unintended.

*Thompson* cited two cases to support the "life without parole" language: *Nukapigak v. State,* 663 P.2d 943 (Alaska 1983), and *Hastings v. State,* 736 P.2d 1157 (Alaska App.1987). Both cases involved defendants who were sentenced to several consecutive 99–year terms and who, therefore, were clearly going to spend the rest of their lives in prison without ever becoming eligible to apply for parole. AS 33.16.100(d). However, George (like the defendant in *Thompson*) received a total sentence of slightly more than 100 years, with normal eligibility for parole. George was 21 years old at the time of his sentencing, and thus he will be eligible for parole well before he turns 60. AS 33.16.090(c) and AS 33.16.100(c)–(d). Judge Schulz was not required to find that a sentence of life without parole was necessary to protect the public since George did not receive such a sentence.